OPINION OF THE COURT
Lewis Bart Stone, J.
This proceeding was commenced by notice of motion, dated April 23, 2007, by petitioner Kahan Jewelry Corp., pursuant to Civil Practice Law and Rules § 7510, to confirm an arbitration award dated March 11, 2007 against respondent, Venus Casting, Inc. On May 22, 2007, Venus replied and served a cross motion to vacate the award pursuant to CPLR 7511.
The parties are in the jewelry business and have been doing business with each other for over 15 years. For the last seven years, this business involved hundreds of transactions conducted in a similar way. Venus would request delivery of gold by sending Kahan a signed, postdated check three or four weeks later, by messenger, with the amount of gold to be purchased indicated on the “memo” line of. the check. The amount of the check would be blank with the price to be set on the postdated date shown on the check. Kahan would deliver the requested gold to the messenger, against the signature by the messenger of a delivery ticket and the messenger would return to Venus with the gold and the delivery ticket. On the date to which the check was postdated, Kahan would fill in the amount on the check, based on the market price of gold that day and deposit the check to its account.
The front of each delivery ticket set forth the name of Kahan and Venus, the date, the amount of gold and the settlement date (i.e., the postdated date), and recited “This is not an invoice” and contained the legend: “This Agreement is subject to the Terms & Conditions on the reverse Side of the Document.” The reverse side provided, inter alia, for arbitration of all disputes before a “Beth Din”[1] in New York, to be conducted in accordance with CPLR article 75 with Kahan having the right to designate which Beth Din.
*686 Kahan, claiming it had not been paid for a series of gold deliveries, each of which was made against delivery tickets signed by Venus’ messenger, selected a Beth Din and commenced an arbitration against Venus. Venus, although given notice of the arbitration and having been advised that it had 20 days to stay arbitration, did not move before any court to stay arbitration or appear at the arbitration hearing. The Beth Din, following a hearing, issued the award.
Kahan asserts that Venus’ cross motion must be rejected because Venus failed to act to stay arbitration within the 20-day period set forth in CPLR 7503 (c). As Venus’ cross motion asserts that no agreement to arbitrate ever existed, Venus is not time-barred from making its cross motion. (See Matter of Matarasso [Continental Cas. Co.], 56 NY2d 264 [1982]; Matter of Steck [State Farm Ins. Co.], 88 NY2d 827 [1996].)
While an agreement to arbitrate must be in writing, New York law does not require that an arbitration agreement be signed. (God’s Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP, 6 NY3d 371 [2006].) Thus, the writing on the delivery ticket would suffice for this purpose. If the parties are deemed to have agreed to such language, they must arbitrate. To determine whether they did, this court must apply principles of contract law.
Venus does not dispute that its messenger signed the face of each relevant delivery ticket, or that Venus’ copy of the relevant delivery tickets were brought back with the gold. Venus, however, contends that its messenger signed solely for the purpose of acknowledging receipt of the gold. Kahan argues that the messenger signed as an agent for Venus and thus binds Venus.
As this court finds that the parties agreed to arbitrate, whether or not Venus’ messenger signed the delivery ticket as agent or merely to acknowledge receipt, it need not determine the authority or agency of Venus’ messenger.
As the parties are merchants as that term is defined in Uniform Commercial Code § 2-104 and the transactions, the sales of gold, are transactions for the sale of goods as defined in UCC 2-105, the transactions are covered by UCC article 2, governing the sale of goods.
UCC article 2 which provides for the enforcement of buyers’ and sellers’ rights in the maelstrom of day-to-day commerce *687 recognizes that agreements or contracts for the sale of goods, especially among merchants who continually deal with each other, are rarely independently negotiated and that it is also common that, as between them, documentation is not reviewed at leisure before each transaction, and that documentation for these transactions often contain extensive terms and conditions which are never expressly discussed by the parties. To balance the need of buyers and sellers to do business efficiently UCC 2-201 (2) provides that in contracts between merchants, boilerplate terms in buyers’ or sellers’ forms delivered at the time of the transaction generally and effectively bind the other party. However, to protect parties from being bound by terms to which they object, where an objection is made to a boilerplate term within 10 days, such term will not be binding. Other rules such as UCC 2-207 also apply where buyers and sellers send each other different forms containing conflicting provisions. As delivery tickets were the sole forms used by the parties in the relevant transactions, UCC 2-207 rules relating to the conflict of forms do not apply.
Implicit to this UCC structure is that where a merchant timely objects to terms, such merchant has effectively rescinded the contract until the terms are resolved and the rescinding merchant may undo the sale transaction and return what had been delivered without penalty. Here, Venus neither made a timely objection to the terms of the delivery ticket nor returned the gold.
While under this statutory analysis it is clear that Kahan and Venus had a contract to sell and buy gold as set forth in the delivery ticket,[2] it is not as clear under case law cited by both parties as to whether a New York court should treat the arbitration clause set forth in the delivery ticket as just another contract term, and enforce it, or whether more is required as a predicate to its enforcement.
Although there was a body of New York law relating to the formation of arbitration agreements between merchants predating the UCC, because the UCC applies here, such cases are no longer of specific relevance. The UCC was enacted in 1962 by chapter 553 of the Laws of 1962 (eff Sept. 27, 1964; UCC 13-105) *688 and applies to transactions entered into after the effective date. (UCC 13-101.)
Among the early cases addressing the issue here was Trafalgar Sq. v Reeves Bros. (35 AD2d 194 [1st Dept 1970]). In Trafalgar, the buyer regularly orally ordered goods from the seller which were shipped. Following each order, the seller sent the buyer a written confirmation which included, on the reverse side, an arbitration clause. The buyer made no objection. Subsequently, the seller sought to arbitrate a dispute and the buyer moved in Supreme Court to stay arbitration. The seller cross-moved to compel arbitration. The Supreme Court stayed arbitration on the grounds that “[i]n the absence of a clear factual showing that petitioner intended to assent to the arbitration clause, the [arbitration] agreement contained in the confirmation forms was a material alteration of the contract and not binding upon the respondent.” (Trafalgar Sq. v Reeves Bros., 7 UCC Rep Serv 712 [Sup Ct, NY County 1970].) The First Department, relying independently on pre-UCC law and UCC 2-201 (2), reversed and compelled arbitration noting “one who receives a ‘writing’ in confirmation of a ‘contract’ has the burden of objecting to its contents within 10 days. There was no objection by the petitioner-respondent in this case.” (35 AD2d at 197.)
The First Department again in 1974 addressed the validity of an arbitration clause contained in a confirmation of an oral contract for goods between merchants apparently sent at the time the goods were shipped. Again, Special Term granted a stay of arbitration and the First Department reversed, ordering arbitration, noting, “A written order following an oral agreement is the usual and recognized contract between the parties and has become part of our statutory law (Uniform Commercial Code, § 2-201, subd. [2]).” (Loudon Mfg. v American & Efird Mills, 46 AD2d 637, 638 [1974].)
This clear signal in the 1970s that arbitration clauses in a confirmatory writing were per se enforceable under UCC 2-201 (2) subsequently began to fade in New York.
In Matter of Marlene Indus. Corp. (Cornac Textiles) (45 NY2d 327 [1978]), the Court of Appeals considered the impact of UCC 2-201 (2) on an arbitration provision in the unsigned forms exchanged between the parties and found them insufficient to create an enforceable agreement to arbitrate. In Marlene, the buyer placed an oral order for goods which was accepted, and immediately thereafter sent its written purchase order, which *689 contained no arbitration clause, and the seller sent its written acknowledgment of the order which contained an arbitration clause. The Court of Appeals, while acknowledging the existence of UCC 2-201 (2), noted that Marlene “presents a classic example of the battle of the forms” (45 NY2d at 331 [internal quotation marks omitted]) and applied UCC 2-207 (2) to resolve the dispute, finding that the arbitration clause had not been agreed to by the parties.
Although Marlene did not address whether UCC 2-201 (2), in the absence of a “battle of the forms,” would impose an obligation to arbitrate where an arbitration clause was set forth in a confirmation, Schubtex, Inc. v Allen Snyder, Inc. (49 NY2d 1 [1979]), decided the next year, extended Marlene to undermine the applicability of UCC 2-201 (2) to arbitration clauses even in such absence. In Schubtex, the seller’s form was the sole form, and it provided for arbitration. The Court found such provision ineffective because there was no showing that the parties contemplated the use of arbitration, and that such showing could not be based solely upon the form itself or the prior dealing of the parties. Schubtex thus rejected the use of confirmatory forms to impose an obligation to arbitrate. In his concurring opinion, Judge Gabrielli set forth policy reasons why arbitration agreements were severable, and that “the threshold for clarity of agreement to arbitrate is greater than with respect to other contractual terms” (id. at 9), further noting,
“It has long been the rule in this State that the parties to a commercial transaction ‘will not be held to have chosen arbitration as the forum for the resolution of their disputes in the absence of an express, unequivocal agreement to that effect; absent such an explicit commitment neither party may be compelled to arbitrate’ (Matter of Acting Supt. of Schools of Liverpool Cent. School Dist. [United Liverpool Faculty Assn.], 42 NY2d 509, 512; accord Gangel v De Groot, 41 NY2d 840, 841; Matter of Riverdale Fabrics Corp. [Tillinghast-Stiles Co.], 306 NY 288, 289; Matter of Lehman v Ostrovsky, 264 NY 130, 132). The reason for this requirement, quite simply, is that by agreeing to arbitrate a party waives in large part many of his normal rights under the procedural and substantive law of the State, and it would be unfair to infer such a significant waiver on the basis of anything less than a clear indication of intent (see Matter of Riverdale Fabrics Corp. *690 [Tillinghast-Stiles Co.], supra, p 289; Siegel, New York Practice, § 588, p 835).
“Since an arbitration agreement in the context of a commercial transaction ‘must be clear and direct, and must not depend upon implication, inveiglement or subtlety . . . [its] existence . . . should not depend solely upon the conflicting fine print of commercial forms which cross one another but never meet’ (Matter of Doughboy Inds. [Pantasote Co.], 17 AD2d 216, 220). Thus, at least under this so-called ‘New York Rule’ (Squillante, General Provisions, Sales, Bulk Transfers and Documents of Title, 33 Business Law 1875, 1881), it is clear that an arbitration clause is a material addition which can become part of a contract only if it is expressly assented to by both parties (see Matter of Doughboy Inds. [Pantasote Co.], supra).” (Id. at 9-10 [citations omitted].)
Following this enunciated rule (hereafter, the New York rule), New York courts have generally declined to enforce arbitration clauses in unsigned confirmations. (See Marek v Laufer & Son, 257 AD2d 363 [1st Dept 1999] [arbitration clause in written confirmation; there was no conflicting writing]; S&T Sportswear Corp. v Drake Fabrics, 190 AD2d 598 [1st Dept 1993] [arbitration clause in “draft sales contract”; it is not clear whether this “draft sales contract” was a confirmation under UCC 2-201]; Matter of Continental Stock Transfer & Trust Co. v Sher-Del Transfer & Relocation Servs., 298 AD2d 336 [1st Dept 2002] [there was a “battle of forms”].)[3]
Thus, the New York rule would require this court to deny Kahan’s motion to confirm the award and grant Venus’ motion to set the award aside as the only evidence of an agreement to arbitrate is the arbitration clause on the reverse of the delivery ticket; there is no independent evidence to show that Kahan and Venus specifically or expressly discussed or otherwise agreed to such clause.
However, the New York rule cannot apply to the extent it is preempted by the Federal Arbitration Act (FAA) (9 USC § 1 et seq.) which Congress adopted to overcome and preempt state *691 restrictions on or resistance to arbitration of disputes involving commerce. (Matter of Smith Barney, Harris Upham & Co. v Luckie, 85 NY2d 193 [1995].) Thus, where an arbitration agreement relates to commerce, the FAA overrides and preempts the New York law. (Matter of Smith Barney Shearson v Sacharow, 91 NY2d 39 [1997]; Progressive Cas. Ins. Co. v C.A. Reaseguradora Nacional De Venezuela, 991 F2d 42 [2d Cir 1993].)
In Progressive, the Second Circuit expressly addressed the impact of the FAA on the New York rule as to the formation of agreements to arbitrate, and stated:
“We agree with the district court that New York law governs here. That law provides that parties will not be held to have chosen arbitration ‘in the absence of an express, unequivocal agreement to that effect.’ Marlene Indus. Corp. v. Cornac Textiles, Inc., 45 N.Y.2d 327, 408 N.Y.S.2d 410, 413, 380 N.E.2d 239, 242 (1978) (quoting Acting Superintendent of Schs. of Liverpool Cent. Sch. Dist. v. United Liverpool Faculty Ass’n, 42 N.Y.2d 509, 399 N.Y.S.2d 189, 191, 369 N.E.2d 746, 748 (1977)). However, New York law requires that nonarbitration agreements be proven only by a mere preponderance of the evidence. See, e.g., Fleming v. Ponziani, 24 N.Y.2d 105, 299 N.Y.S.2d 134, 139, 247 N.E.2d 114, 118 (1969). Because Perry [v Thomas (482 US 483 [1987])] prohibits such discriminatory treatment of arbitration agreements, the rule set forth in Marlene Industries is preempted. Accordingly, in determining whether the parties have agreed to arbitrate, we apply the ordinary preponderance of the evidence standard.” (991 F2d at 46.)
Accordingly, New York decisions which Eire based on Marlene and its progeny (which would include Schubtex) are subject to preemption by the FAA to the extent they require a court to apply stricter standards to determine whether the parties had an agreement to arbitrate than to determine whether they entered into a similarly situated agreement not involving Eirbitration.
In Matter of J.J. ’s Mae, Inc. v Warshow & Sons (277 AD2d 128 [1st Dept 2000]), the First Department considered the impact of Progressive on Marlene and the New York rule in the context of a battle of forms under UCC 2-207 (2) (b) which requires Em express awareness to incorporate a material difference between the conflicting forms whether the material alteration was an arbitration clause or any other term.
*692 The First Department in J.J. ’s Mae, Inc. is quite dubious as to the validity of Progressive, however, stating “[e]ven if we were to agree, however, that Progressive . . . bars application of the Marlene Industries rule per se in matters of interstate[4] commerce” the clause still, under UCC 2-207 (2) (b), was not agreed to. The result, however, would be fully consistent with Progressive to the extent the standard as to whether the parties had agreed to the arbitration clause would be the same as the standard as to whether the parties had agreed to any other “material alteration” under UCC 2-207 (2) (b). This, however, was not discussed by the Court. In any event, J.J. ’s Mae, Inc. relates to the battle of forms under UCC 2-207 (2) (b), and not to the case of the single written confirmation between merchants under UCC 2-201 (2) which is the subject of this proceeding. The First Department’s short memorandum decision includes no other discussion of the interplay between the FAA and the New York rule.
Subsequent to J.J.’s Mae, Inc., the Second Circuit had another opportunity to consider this interplay in Aceros Prefabricados, S.A. v TradeArbed, Inc. (282 F3d 92 [2d Cir 2002]). While Aceros involved a “battle of the forms” under UCC 2-207 (2) and not a confirmation between merchants under UCC 2-201 (2), the Second Circuit reiterated its holding in Progressive and vacated the District Court decision rejecting arbitration relying on J.J. ’s Mae, Inc. and another District Court case which had relied on Marlene Indus.
As the transaction between Kahan and Venus was a transaction involving commerce, the FAA requires the inquiry as to whether they agreed to arbitrate to be no different than the inquiry as to whether they agreed to any of the other terms of the delivery ticket. As UCC 2-201 (2) would make other terms of the delivery ticket binding if not objected to within 10 days of receipt, the FAA requires the arbitration clause in the delivery ticket also to be enforced if it was not objected to within such 10-day period.
Thus, notwithstanding that the New York rule may be applicable to contracts not involving commerce, it cannot require a different standard to be applied to arbitration and nonarbitration provisions in a single written confirmation of an oral order *693 relating to the sale of goods between merchants subject to UCC 2-201.
The parties both contend that their positions are so clear that sanctions must be imposed on the other party pursuant to 22 NYCRR 130-1.1 because of their frivolous litigation conduct. Such provision provides inter alia that conduct is frivolous if:
“(1) it is completely without merit in law and cannot be supported by a reasonable argument for an extension, modification or reversal of existing law; [or]
“(2) it is undertaken primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another.” (22 NYCRR 130-1.1 [e].)
As this decision reveals, this court finds the issue presented is one where the applicable rules have been changed over recent times and that the conflict of New York law precedents and the relevant decisions of the federal courts which have preempted decisions of the New York Court of Appeals have not been finally clarified by the New York Court of Appeals or the United States Supreme Court. Accordingly, clarity of law required to find frivolity is absent. The court further notes that neither party seems aware of the FAA or relevant decisions thereunder. Accordingly, it cannot be said that their positions are intentionally to harass, delay or maliciously injure the other. As a result, the court rejects both parties’ requests for sanctions.
Kahan’s motion to enforce the award is therefore granted and Venus’ cross motion to dismiss is therefore denied.

. A Beth Din is a rabbinical court. There are many Beth Dins, maintained by different segments of the orthodox Jewish community. Venus does not *686 dispute whether the Beth Din selected by Kahan, which rendered the award, was a Beth Din within the meaning of the arbitration clause.

. Both parties properly treat the delivery ticket as the relevant contract— Kahan claiming that Venus agreed to it and Venus claiming that it did not. Further, although the document is called a “Delivery Ticket,” article 2 does not require that agreements relating to sales be in any particular form and it is irrelevant what the document is called.

. But cf. Brett Fabrics v Garan, Inc., 170 AD2d 253 (1st Dept 1991) (enforcing an arbitration clause against the seller who included the clause in its own confirmation); Brower v Gateway 2000, 246 AD2d 246 (1st Dept 1998) (enforcing an arbitration clause in a contract sent to a consumer with a computer that provided it was binding if the computer was not returned in 30 days).

. The FAA, although adopted by Congress on the authority of the interstate commerce clause (US Const, art I, § 8 [3]), applies to every “transaction involving commerce,” except for enumerated transactions not relevant here. (9 USC § 2.)